United States District Court
Southern District of Texas
**ENTERED**
November 10, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHIRLEY FRANCIS, Individually and as Administrator of the Estate of GERRIT PERKINS, and BRIDGET NERIZ, | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § § | CIVIL ACTION NO. H-14-2943 |
| HARRIS COUNTY, SHERIFF ADRIAN GARCIA, in His Official Capacity, DEPUTY CHARLES M. GBUNBLEE, Individually and in His Official Capacity, and DEPUTY B. REYES, Individually and in His Official Capacity, | § § § § § § § § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Shirley Francis ("Francis"), individually and as Administrator for the Estate of Gerrit Perkins ("Perkins"), and Bridget Neriz ("Neriz"), bring this action against Harris County, Texas, Harris County Sheriff Adrian Garcia, in his official capacity, and Harris County Sheriff Deputies Charles M. GBunblee ("GBunblee") and Basilo Reyes ("Reyes"), in both their individual and official capacities, for claims based on federal and state law arising from the allegedly unreasonable search of the residence at 17011 Analisa Circle, Houston, Texas, unlawful arrest of Neriz, and excessive uses of force against Neriz and Perkins on October 17, 2012.[1]  Pending before the court is Defendants' Motion for Summary

---

[1]Plaintiffs' Second Amended Complaint, Docket Entry No. 33.

Judgment (Docket Entry No. 60), Plaintiffs' Motion to Strike Affidavit of Jared Zwickey (Docket Entry No. 67), and Defendants' Objections and Motion to Strike Evidence from Plaintiffs' Response (Docket Entry Nos. 69 and 70). For the reasons explained below, defendants' motion for summary judgment will be granted, plaintiffs' motion to strike the Zwickey affidavit will be denied as moot, defendants' objections and motion to strike evidence will be granted in part and denied, and this action will be dismissed.

## I. **Standard of Review**

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment. Fed. R. Civ. P. 56(c). Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2511 (1986). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material

fact,' but need not <u>negate</u> the elements of the nonmovant's case."
<u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994)
(<u>en banc</u>).   If the moving party meets this burden, Rule 56(c)
requires the nonmovant to go beyond the pleadings and show by
admissible evidence that specific facts exist over which there is
a genuine issue for trial.   <u>Id.</u>   Factual controversies are to be
resolved in favor of the nonmovant, "but only when . . . both
parties have submitted evidence of contradictory facts."   <u>Id.</u>

## II. <u>Undisputed Facts</u>

GBunblee and Reyes are licensed peace officers employed as
deputies by the Harris County Sheriff's Office.[2]   On September 21,
2012, GBunblee was dispatched to the residence at 17011 Analisa
Circle, following a 911 call received from Neriz.   Neriz informed
GBunblee that during an argument, her boyfriend, Perkins, pushed
her to the floor and placed a knife against her neck as he choked
her with his other hand, stating that he would kill her.   Neriz
told GBunblee that after striking her in the face several times
with the flat side of the knife, Perkins lifted her off of the
floor, grabbed her in a headlock, removed her to the bedroom, took

---

[2]Affidavit of Harris County Sheriff's Office Deputy Charles
M. GBunblee ("GBunblee Affidavit"), Exhibit A to Defendants' Motion
for Summary Judgment ("Defendants' MSJ"), Docket Entry No. 60-1,
p. 1 ¶ 2; Affidavit of Harris County Sheriff's Office Deputy
Basilio Reyes ("Reyes Affidavit"), Exhibit B to Defendants' MSJ,
Docket Entry No. 60-2, p. 1 ¶ 2.

a handgun from a drawer beside the bed, dragged her into the closet and pointed the handgun at her, telling her he intended to kill her and then kill himself.[3] GBunblee called the Harris County District Attorney's Office and spoke to Assistant District Attorney Wakefield who accepted the charge of aggravated assault with a deadly weapon against Perkins. GBunblee subsequently sought an arrest warrant for Perkins.[4]

A warrant for Perkins' arrest was issued and assigned for execution to the Harris County Gulf Coast Violent Offenders Task Force ("Task Force").[5] Task Force members Sergeant G. Wilke of the Harris County Sheriff's Office, and Special Agent G. Welters of the Texas Department of Public Safety conducted surveillance on the residence at 17011 Analisa Circle with no results. The Task Force members did, however, develop an anonymous source who promised to call the Task Force if Perkins was seen going into the residence.[6] At about 8:00 p.m. on October 17, 2012, Welters advised Wilke that

---

[3]GBunblee Affidavit, Exhibit A to Defendants' MSJ, Docket Entry No. 60-1, at pp. 3-4 ¶ 7.

[4]Id. at p. 4 ¶ 8. See also Incident Report, Exhibit A-2 to Defendants' MSJ, Docket Entry No. 60-1, pp. 10-16.

[5]Defendants' MSJ, p. 6 ¶ 18, Docket Entry No. 60, p. 15 ¶ 18. See also Plaintiffs' Response to Defendants' MSJ ("Plaintiffs' Response"), Docket Entry No. 66, p. 16 ("[I]t is conceded that defendants had a valid felony arrest warrant for Perkins which charged him with assaulting Bridget Neriz.").

[6]Incident Report of Sergeant G. Wilke, Exhibit A to Defendants' Reply, p. HC/PERKINS-91, Docket Entry No. 72-1, p. 12.

-4-

the anonymous source called to tell him that Perkins had arrived home in a silver SUV with a handicap license plate, and that the anonymous source was calling Crime Stoppers to report having seen Perkins at 17011 Analisa Circle.   After confirming the Crime Stoppers tip, Wilke called GBunblee to ask if he could try to execute the felony arrest warrant.[7]   GBunblee checked with his supervisor who authorized the arrest but instructed GBunblee to take additional deputies with him and not to force entry into the residence.[8]   GBunblee contacted Harris County Sheriff's Deputies Reyes and W.R. Mendez for assistance.   GBunblee also checked the Harris County Judicial Information Management System to confirm that the felony arrest warrant for Perkins was still valid. GBunblee then met deputies Reyes and Mendez, showed them Perkins' mugshot, and told them that Perkins was over six feet tall, weighed at least 250 pounds, and may be armed.[9]

The deputies saw a vehicle matching the description received from the tipster — a silver SUV with a handicap license plate — parked in the driveway at 17011 Analisa Circle.   After GBunblee felt the SUV's hood and found it warm, the deputies knocked on the

---

[7]Incident Report of Sergeant G. Wilke, Exhibit A to Defendants' Reply to Plaintiffs' Response to Defendants' Motion for Summary Judgment ("Defendants' Reply"), p. HC/PERKINS-91, Docket Entry No. 72-1, pp. 12-13.   See also GBunblee Affidavit, Exhibit A to Defendants' MSJ, Docket Entry No. 60-1, p. 5 ¶ 10.

[8]GBunblee Affidavit, Exhibit A to Defendants' MSJ, Docket Entry No. 60-1, at p. 5 ¶ 11.

[9]Id. at ¶ 12.

front door but left after receiving no answer.[10]  Reyes left the
area, but GBunblee stopped at a neighbor's house to ask if Perkins
had been seen.  While GBunblee was talking to the neighbor, he saw
Neriz walk out the front door of the residence at 17011 Analisa
Circle to place something in a trash can.  GBunblee radioed Reyes
and Mendez to come back, approached Neriz, and asked if Perkins or
anyone else was in the house to which Neriz responded, "No."  After
being asked to secure her dog, Neriz walked the dog into the back
yard leaving her front door open.  When Mendez arrived GBunblee
drew his weapon and entered the house together with Mendez.[11]
Because the house was dark inside, GBunblee used his flashlight to
increase visibility.  When Reyes arrived, he and Mendez went to the
second floor while GBunblee remained on the first floor.

GBunblee searched the first floor beginning with the living
room and kitchen area.  As GBunblee began to enter the  master
bedroom, he instructed Neriz to stay in the living room and kitchen
area.  Because the only light in the bedroom came from a
television, GBunblee continued to use his flashlight for
illumination.  After announcing himself and asking if anyone was
present but receiving no answer, GBunblee searched the master
bedroom.  GBunblee then began to enter the master bathroom which

---

[10]Id. at 5-6 ¶ 13.

[11]Id. at 6 ¶¶ 14-15.  See also Audio Transcription Labeled
740709.wma Statement of Bridge[t] Neriz ("Neriz Audio Transcript"),
Exhibit H to Defendants' MSJ, Docket Entry No. 60-20, pp. 10:4-
11:11.

was dark.  GBunblee announced himself and asked if anyone was present but received no answer.  When GBunblee tried to open the door of a walk-in closet he could feel a large object holding the door closed.  GBunblee announced himself at the closet door at least twice, pushed the closet door partly open, and saw Perkins kneeling, crouching, or squatting on the floor with his back to GBunblee and his arms and hands in front of his body.  GBunblee ordered Perkins to show his hands by putting them above his head, but Perkins did not comply.  Instead, Perkins began quickly and abruptly to stand and turn towards GBunblee.  Upon seeing a black object in Perkins' left hand about the size of a handgun, GBunblee fired his service weapon hitting Perkins in the right side of his back.  Perkins fell in the closet doorway and dropped the black object which was a cordless telephone.[12]

Upon hearing the shot, Reyes and Mendez came to GBunblee's location.  Reyes radioed that shots had been fired and that EMS was needed for Perkins.  Neriz entered the master bedroom.  Reyes ordered her to get on the ground, and when Neriz did not comply, Reyes physically took Neriz to the ground, handcuffed her, and placed her into a parked patrol vehicle.[13]  Perkins was pronounced dead at the North Cypress Medical Center in Cypress, Texas, later that evening.[14]

---

[12]Id. at 7-8 ¶¶ 15-16.

[13]Reyes' Affidavit, Exhibit B to Defendants' MSJ, Docket Entry No. 60-2, p. 4 ¶ 9.

[14]Supplemental Designation of Dr. Adame, Plaintiffs' Exhibit
(continued...)

### III. **Federal Law Claims**

Plaintiffs allege that in committing the acts that occurred at the Analisa Circle residence on October 17, 2012,

> GBunblee and Reyes acted under color of state law to deprive Plaintiffs of certain constitutionally protected rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States including. . .:
>
> a)   the right to be free from unreasonable searches and seizures;
>
> b)   the right not to be deprived of liberty without due process of law;
>
> c)   the right to be free from excessive use of force . . .; and
>
> d)   the right to be free from false arrest.[15]

"Plaintiffs bring claims against GBunblee and Reyes in their individual and official capacities pursuant to 42 U.S.C. § 1983."[16] Plaintiffs allege that Sheriff Garcia and Harris County are liable because they failed to adequately train and supervise GBunblee and Reyes, and maintained a policy, custom, or practice that allowed GBunblee and Reyes to violate Perkins' and Neriz' rights.[17]

―――――――――――――――――

[14](...continued)
3, p. 2, Docket Entry No. 66-3, p. 5.

[15]Plaintiffs' Second Amended Complaint, Docket Entry No. 33, pp. 10-11 ¶ 78.  Plaintiffs allege that defendants violated the Fifth Amendment, but the Fifth Amendment applies only to violations of rights by a federal actor.  See Morin v. Caire, 77 F.3d 116, 120 (5th Cir. 1996).  Plaintiffs have not alleged that any of the defendants were acting under federal authority. Defendants are therefore entitled to judgment as a matter of law on any claims asserted or attempted to be asserted under the Fifth Amendment.  See Jones v. City of Jackson, 203 F.3d 875, 880 (5th Cir. 2000).

[16]Plaintiffs' Second Amended Complaint, Docket Entry No. 33, p. 11 ¶ 81.

[17]Id. at 8 ¶ 55 ("Sheriff Adrian Garcia [] failed to provide
(continued...)

## A.   Applicable Law

42 U.S.C. § 1983 provides a private right of action for the deprivation of rights, privileges, and immunities secured by the Constitution or laws of the United States.   Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.   "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"   Graham v. Conner, 109 S. Ct. 1865, 1870 (1989)  (quoting Baker v. McCollan, 99 S. Ct. 2689, 2694 n. 3 (1979)).   To establish § 1983 liability, plaintiffs must prove that they suffered "(1) a deprivation of a right secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor."   Victoria W. v. Larpenter, 369 F.3d 475, 482 (5th Cir. 2004).   Plaintiffs must also show that the constitutional deprivation they suffered was intentional or due to deliberate indifference and not the result of mere negligence.   Id.

---

[17](...continued)
supervision and/or proper training to prevent deadly outcomes resulting from excessive force"); and 12 ¶¶ 89-94 (Harris County liability).

"The first inquiry in any § 1983 suit" is "to isolate the precise constitutional violation with which [the defendant] is charged." Graham, 109 S. Ct. at 1870. "The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right." Id. at 1871. Plaintiffs' allegations that defendants' actions deprived them of liberty without due process of law by violating their rights to be free from unreasonable searches and seizures, excessive use of force, and false arrest, are claims that must be analyzed under the Fourth Amendment. Id. at 1871-73 (citing Tennessee v. Garner, 105 S. Ct. 1694, 1699-1707 (1985)).

**B.    The Individual Defendants Are Entitled to Summary Judgment**

Plaintiffs have asserted § 1983 claims against deputies GBunblee and Reyes in both their personal and official capacities, and against Sheriff Garcia in his official capacity. Public officials may be sued pursuant to 42 U.S.C. § 1983 in their official and/or their personal capacities. Hafer v. Melo, 112 S. Ct. 358, 361-63 (1991) (citing Kentucky v. Graham, 105 S. Ct. 3099 (1985)).

> [T]he distinction between official-capacity suits and personal-capacity suits is more than "a mere pleading device." . . State officers sued for damages in their official capacity are not "persons" for purposes of the suit because they assume the identity of the government that employs them. . . By contrast, officers sued in their personal capacity come to court as individuals. A government official in the role of personal-capacity defendant thus fits comfortably within the statutory term "person."

Id. at 362.

1.   Official Capacity Claims

The real party in interest in an official-capacity suit is the governmental entity, not the named official.  Id. at 361 ("Suits against state officials in their official capacity . . . should be treated as suits against the State.").  See also Bennett v. Pippin, 74 F.3d 578, 584 (5th Cir.), cert. denied, 117 S. Ct. 68 (1996) ("When Mrs. Bennett sued the Sheriff in his individual and official capacity, she sued two defendants:  the Sheriff and the County.").  See also Turner v. Houma Municipal Fire and Police Civil Service Board, 229 F.3d 478, 483 (5th Cir. 2000) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'  . . Accordingly, a § 1983 suit naming defendants in only their 'official capacity' does not involve personal liability to the individual defendant.")

In response to defendants' motion for summary judgment, plaintiffs state that they "have no objection to the Court dismissing without prejudice the official capacity claims."[18] Plaintiff's claims against the defendant deputies and Sheriff Garcia in their official capacities are in essence claims against Harris County.  See Graham, 105 S.Ct. at 3105.   See also Goodman v. Harris County, 571 F.3d 388, 396 (5th Cir. 2009), cert. denied sub nom Ashabranner v. Goodman, 130 S. Ct. 1143 and 1146 (2010)

---

[18]Plaintiffs' Response, Docket Entry No. 66, p. 38.

("official capacity suits are really suits against the governmental entity").  Since Harris County is already named as a defendant in this action, defendants are entitled to summary judgment on the claims asserted against GBunblee, Reyes, and Sheriff Garcia in their official capacities because Harris County is the real party in interest.  See <u>Bennett</u>, 74 F.3d at 584 ("A suit against the Sheriff in his official capacity is a suit against the County.").  Accordingly, defendants' motion for summary judgment on the official capacity claims asserted against the individual defendants will be granted.

    2.  <u>Personal Capacity Claims</u>

Governmental officials sued in their personal capacities are entitled to qualified immunity.  Qualified immunity protects "government officials performing discretionary functions" from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 102 S. Ct. 2727, 2738 (1982).  <u>See Sanders-Burns v. City Of Plano</u>, 594 F.3d 366, 378 (5th Cir. 2010) (qualified immunity is "a defense against an individual capacity lawsuit").  Qualified immunity is "an *immunity from suit* rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial."  <u>Mitchell v. Forsyth</u>, 105 S. Ct. 2806, 2815 (1985).

At summary judgment, plaintiffs bear the burden to demonstrate that the defendant official is not entitled to qualified immunity. Vincent v. City of Sulphur, 805 F.3d 543, 547 (5th Cir. 2015), cert. denied, 136 S. Ct. 1517 (2016).  To overcome an assertion of qualified immunity plaintiffs must establish that: (1) the defendants' actions violated the plaintiffs' federal rights; and (2) those rights were clearly established at the time.  Id.  Courts are free to decide which of the two prongs to address first.  Id.  See also Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)("lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first").  "The court must 'ask whether the law so clearly and unambiguously prohibited [the official's] conduct that every reasonable official would understand that what he is doing violates [the law].'"  Id. (quoting Morgan v. Swanson, 659 F.3d 359, 371 (5th Cir. 2011) (en banc)).

### (a)  Unreasonable Search Claims

Plaintiffs allege that GBunblee and Reyes violated Neriz' and Perkins' Fourth Amendment rights by unreasonably searching the residence at 17011 Analisa Circle without cause.  Plaintiffs allege that the defendants' decision to enter the residence was unreasonable because the information they had was either contrary to or not supportive of a belief that Perkins was there, defendants failed to obtain independent corroboration that Perkins was there,

the residence was dark, and defendants failed to use a canine to search and clear the premises, or to coax Perkins out.[19]

Defendants argue that they are entitled to summary judgment on plaintiffs' claims for unreasonable search because Neriz consented to the search,[20] and because when GBunblee and Reyes entered the residence they had a felony warrant for Perkins' arrest and reasonably believed that Perkins both resided at and was present within the residence.[21]   As evidence that Neriz consented to the deputies' search of the Analisa Circle residence, defendants cite the Audio Transcription of the statement Neriz made to Harris County Sheriff Deputy Jason Brown on October 17, 2012:

Q.   Just one officer or more than one?

A.   No, there was one and then another one came and then were was two. And then they go, "Is he in the house?"

And I said, "No, nobody is in the house."  I didn't even know if he was still there because I figured he probably took off.  I didn't know what was going on.  So, I told him, "No, nobody is in the house.  I live here by myself.  Nobody is in the house."

So, then he said, "Can we search the house?"

I said, "Yeah," I said, "but I got my dogs in the house.  I have a Rottweiler."

---

[19]Plaintiffs' Second Amended Complaint, Docket Entry No. 33, p. 8 ¶¶ 56-60.  See also Defendants' MSJ, p. 4 ¶ 11, Docket Entry No. 60, p. 13 ¶ 11.

[20]Defendants' MSJ, p. 19 ¶ 47, Docket Entry No. 60, p. 28 ¶ 47.

[21]Defendants' Reply, Docket Entry No. 72, pp. 2-8 ¶¶ 2-12.

So, then he goes, "Well, we need to search the house."

I said, "okay." I opened the door. The dogs c[a]me out.

They're frantic about the dogs, and they're telling me, "Put the dogs away, put the dogs away."

I said, "Okay." So, I grabbed my dog. I took him, walked to the back door and let him [out]. While I was letting [the dog out] the back door police officers came in and began to search the house. One went upstairs, the other one was walking through the kit -- it's not a family room -- the front of the house, where the table is. And he walked into the kitchen and I just stood there saying, "What's going on?"

And he goes, "We're going to search the house."

I said, "Okay."[22]

As evidence that GBunblee and Reyes reasonably believed that Perkins resided at the Analisa Circle residence, defendants cite the probable cause affidavit GBunblee filed following his previous response to that residence on September 21, 2012. That affidavit cites Neriz as stating that she and Perkins "who she knows by name and by sight as her common law husband, were at the house they share located at 17011 Analisa Circle, Houston, Harris County, Texas on September 21, 2012. . ."[23] Defendants also cite Perkins'

---

[22]Neriz Audio Transcript, Exhibit H to Defendants' MSJ, Docket Entry No. 60-20, pp. 10:4-11:11.

[23]Defendants' Reply, Docket Entry No. 72, p. 5 ¶ 7 (quoting Exhibit I to Defendants' MSJ, Docket Entry No. 60-21, p. HC/Perkins-816 (Probable Cause Statement in Complaint filed in Cause No. 1362041, *State v. Gerrit A. Perkins*)).

criminal records, all of which identify 17011 Analisa Circle as his
address.[24]  As evidence that GBunblee and Reyes reasonably believed
Perkins was present inside the Analisa Circle residence when they
entered, defendants cite an anonymous tip received by Task Force
member Welters that Perkins was seen arriving there in a described
vehicle,[25] Task Force member Wilke's confirmation of the tip with
Crime Stoppers,[26] and GBunblee's affidavit stating that he not only
observed the described vehicle parked in the driveway of the
residence, but he also felt the vehicle's hood and found it warm.[27]

### (1)   Applicable Law

Absent exigent circumstances or consent, the Fourth Amendment
prohibits law enforcement from entering into an individual's home
to make a felony arrest without a warrant.  <u>Payton v. New York</u>, 100
S. Ct. 1371, 1374-75 (1980).  Defendants argue that Neriz' consent
and the valid felony arrest warrant for Perkins provided GBunblee
and Reyes authority to enter the residence on October 17, 2012.

---

[24]<u>Id.</u> (citing Exhibit I to Defendants' MSJ, Docket Entry
No. 60-21 (certified copies of Perkins' criminal records)).

[25]<u>Id.</u> at 6 ¶ 9 (citing Exhibit A, Incident Report of Sergeant
G. Wilke, pp. HC/PERKINS-91-92, Docket Entry No. 72-1, pp. 12-13).

[26]<u>Id.</u> (citing Exhibit A, Incident Report of Sergeant G. Wilke,
p. HC/PERKINS-92, Docket Entry No. 72-1, p. 13).

[27]GBunblee Affidavit, Exhibit A to Defendants' MSJ, Docket
Entry No. 60-1, at pp. 5-6 ¶¶ 10-13 (describing the vehicle as a
silver SUV with a handicap license plate).

### (2)  Application of the Law to the Undisputed Facts

#### (i)  Consent

Citing the audio transcription of Neriz's interview with Deputy Brown on October 17, 2012, defendants argue that after Neriz told them that no one was in the house, Neriz consented to their request to search the house.[28]  Without disputing that Neriz told Deputy Brown that she had consented to the defendants' request to search the house, plaintiffs argue that

> Bridget Neriz has repudiated her unsworn statement made on October [1]7, 2012 in which she stated that she gave defendants permission to enter her home in her affidavit. Pls. Ex. 16.  She explained that when she made this statement, she was under the influence of trauma and fear after having been on that same evening assaulted by Reyes and handcuffed and forced to remain in a police car while handcuffed for almost four hours before she was questioned.  She also said she was "confused, frightened, exhausted and greatly upset" after being told that Perkins was dead.  She further stated that she was also subjected to police threats that she was in trouble and that she should be cooperative with the police.[29]

Neriz states in her affidavit:

> Having been warned to be cooperative, when I was asked whether I consented or agreed to allow the officers to enter my residence, I felt that since I was not under oath, it was in my best interest to say that I did give my consent when in fact that was not true.[30]

---

[28]Defendants' MSJ, p. 19 ¶ 47, Docket Entry No. 60, p. 28 ¶ 47 (citing Neriz Audio Transcript, Exhibit H, Docket Entry No. 60-20, p. 10:8-17).  See also Defendants' Reply, Docket Entry No. 72, pp. 2-8 ¶¶ 2-12.

[29]Plaintiffs' Response, Docket Entry No. 66, p. 19 (citing Plaintiffs' Exhibit 16, Bridget Neriz' Affidavit ("Neriz' Affidavit"), p. 2 ¶¶ 7-16, Docket Entry No. 66-16, p. 3 ¶¶ 7-16).

[30]Neriz' Affidavit, p. 3 ¶ 27, Plaintiffs' Exhibit 16, Docket
(continued...)

As additional evidence that Neriz did not consent to the search of the Analisa Circle residence, plaintiffs cite the voluntary statement of Mendez who said:

> The female [Bridget Neriz] again stated "I haven't seen him in a month."  I told the female since it's a Felony warrant; we were going to search the residence for the suspect.
>
> Deputy GBunblee was escorting the female towards the back door to let the dog out to the back yard.  I entered the residence with Deputy Reyes . . .[31]

Because Mendez failed to mention that Neriz gave her permission or consent for the deputies to search or enter the home, and because Mendez states that he told Neriz they were going to search the house since they had a warrant, Mendez' statement is inconsistent with the defendants' contention that Neriz consented to the search, and sufficient to raise a question of fact on that issue.  Since, however, for the reasons stated in § III.B.2(a)(2)(ii), below, the court concludes that the deputies had reason to believe that Perkins resided at 10711 Analisa Circle, and that Perkins was present on October 17, 2012, when they entered the house, the fact issue regarding whether Neriz consented to the search is not a genuine issue of material fact that precludes the court from granting defendants' motion for summary judgment.

---

[30](...continued)
Entry No. 66-16, p. 4 ¶ 27.

[31]Plaintiffs' Response, Docket Entry No. 66, p. 19 (quoting Deputy W. Mendez Voluntary Statement, Plaintiffs' Exhibit 8, Docket Entry No. 66-8, p. 2).

(ii) Arrest Warrant

The authority of law enforcement to enter a home to execute a valid arrest warrant depends on whether the subject of the arrest warrant resides at and is presently within a particular residence. Payton, 100 S. Ct. at 1388.  "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."  Id. Although the Supreme Court did not define the "reason to believe" standard in Payton, the Fifth Circuit has stated that

> [l]ike "reasonable suspicion" or "probable cause" the requirement that an officer have a "reasonable belief" is not a finely-tuned standard. . . "Reasonable belief" can only be ascertained through a weighing of the facts in the record, as it is a "fluid concept[] that takes [its] substantive content from the particular contexts in which the standard[] [is] being assessed.

United States v. Barrera, 464 F.3d 496, 500 (5th Cir. 2006), cert. denied, 127 S. Ct. 2247 (2007) (citing Ornelas v. United States, 116 S. Ct. 1657, 1661 (1996)(explaining that the terms "reasonable suspicion," "probable cause," and "reasonable belief" are "commonsense, nontechnical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act"), and quoting Illinois v. Gates, 103 S.Ct. 2317, 2329 (1983)).  Additionally, the Fifth Circuit has applied the reasonable belief standard to both the requirement that the subject reside at the address and that the subject be located there. Id. at 501-03.

-19-

Citing <u>Barrera</u>, 464 F.3d at 496, plaintiffs argue that GBunblee and Reyes could not reasonably have believed that Perkins was inside the Analisa Circle residence when they entered because the vehicle parked in the driveway was not owned by Perkins but by his mother, Francis. Plaintiffs argue

> [i]t is indeed strange that the defendants failed to do a registration check with the Department of Motor Vehicles to determine who was the registered owner of this vehicle before they entered the residence because this simple act of checking on the registered owner would have at least alerted them that they could not rely on a belief that this particular vehicle was Perkins' vehicle and therefore he was likely in the residence before they entered.[32]

Plaintiffs do not dispute and, in fact, concede, that the defendants had a valid felony arrest warrant for Perkins.[33] Nor do plaintiffs argue that defendants did not reasonably believe that Perkins resided at 10711 Analisa Circle. GBunblee's statement in the probable cause affidavit that he prepared in September 2012 identifying Perkins' address as 10711 Analisa Circle, and Perkins' criminal records all of which show his address as 10711 Analisa Circle, corroborate GBunblee's and Reyes' reasonable belief that Perkins resided at 10711 Analisa Circle. Although plaintiffs argue that defendants could not reasonably have believed that Perkins was present inside the residence when they entered, the court concludes

---

[32]Plaintiffs' Response, Docket Entry No. 66, pp. 17-18.

[33]<u>Id.</u> at 16 ("[I]t is conceded that defendants had a valid felony arrest warrant for Perkins which charged him with assaulting Bridget Neriz.").

that the information GBunblee received from Task Force member
Wilke, i.e., that an anonymous source had reported to both Task
Force member Welters and to Crime Stoppers, that Perkins had
arrived home driving a silver SUV with handicap license plates,
coupled with GBunblee's observation of such a vehicle parked in the
driveway of the residence and GBunblee's determination that the
vehicle's hood was warm, constitutes information from which
GBunblee and Reyes could have formed a reasonable belief that
Perkins was present inside the residence when they entered.  See
Barrera, 464 F.3d at 500-02 (citing United States v. Route, 104
F.3d 59, 62-63 (5th Cir. 1997) (officer's reasonable belief that
the co-defendant was in the residence when they entered was
confirmed by the presence of a vehicle in the driveway and noise
from a television inside the residence)).

Plaintiffs argue that the court should, nevertheless, deny the
defendants' motion for summary judgment because GBunblee failed and
refused to identify by name the Task Force member who allegedly
gave him information regarding Perkins' arrival at 17011 Analisa
Circle on October 17, 2012,[34] and because plaintiffs' expert
witness, Philip Hayden, stated that he did "not believe that
properly trained law enforcement officers would find it reasonable
to search a dark house alone in order to confront Mr. Perkins."[35]

---

[34] Id. at 24.

[35] Id. at 26 (quoting Philip Hayden Expert Opinion Report,
(continued...)

Plaintiffs' argument that GBunblee failed to identify the Task Force member who provided him information about Perkins' presence at 17011 Analisa Circle has no merit because defendants have submitted evidence showing that the identity of the Task Force member with whom GBunblee spoke about Perkins' presence at 17011 Analisa Circle on October 17, 2012, was provided to plaintiffs on April 12, 2015, as part of Defendants' Initial Disclosures.[36] Plaintiffs' reliance on Hayden's opinion that GBunblee and Reyes unreasonably searched the Analisa Circle residence for Perkins also lacks merit because Hayden's opinion on the reasonableness of the deputies' search is not admissible.   Federal Rule of Evidence 704(a) states that "[a]n opinion is not objectionable just because it embraces an ultimate issue," but that rule "does not allow a witness to give legal conclusions." United States v. Izydore, 167 F.3d 213, 218 (5th Cir. 1999). "Reasonableness under the Fourth Amendment or Due Process Clause is a legal conclusion." United States v. Williams, 343 F.3d 423, 435 (5th Cir.), cert. denied, 124 S. Ct. 966 (2003)(citations omitted).    "[T]he ultimate determination of Fourth Amendment objective reasonableness is a question of law." Ramirez v. Knoulton, 542 F.3d 124, 128 (5th Cir. 2008).   Hayden's opinions as to the reasonableness of the search

---

[35](...continued)
Plaintiffs' Exhibit 1, p. 4, Docket Entry No. 66-1, p. 5).

[36]Defendants' Reply, Docket Entry No. 72, pp. 5-6 ¶ 8 (citing Exhibit A, Defendants' Initial Disclosures including a copy of Bates numbers HC/PERKINS-91-92, Incident Report of Sergeant G. Wilke, Docket Entry No. 72-1, pp. 12-13).

conducted by the defendants are inadmissible legal conclusions because they would not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).[37]

Because GBunblee and Reyes had a valid felony arrest warrant for Perkins, because they had reason to believe that Perkins resided at 17011 Analisa Circle and was present inside that residence on October 17, 2012 when they entered, and because plaintiffs have failed to cite and the court has failed to find any authority holding that search of a dark residence for purposes of executing a valid felony arrest warrant violates a right guaranteed by the Fourth Amendment, the court concludes that defendants' entry into the Analisa Circle residence was legally authorized and did not violate the Fourth Amendment rights of Perkins or Neriz to be free from unreasonable searches.  The court concludes therefore that GBunblee and Reyes are entitled to qualified immunity on plaintiffs' claims for unreasonable search of the residence at 17011 Analisa Circle on October 17, 2012.

---

[37]Citing Federal Rule of Evidence 802, defendants object and move to strike Hayden's expert report asserting that the report is unsworn and contains inadmissible hearsay.  See Defendants' Objections and Motion to Strike Evidence from Plaintiffs' Response, Docket Entry No. 69, pp. 1-2 ¶¶ 1 and 3.  Rule 56 requires that a party's submissions in opposition to a motion for summary judgment set forth facts that "would be admissible in evidence."  Fed. R. Civ. P. 56(e).  The opinions contained in Hayden's report are premised upon Hayden's review of 37 different documents received from plaintiffs' attorneys. See Attachment # 3 to Plaintiffs' Exhibit 1, Philip Hayden Expert Opinion Report, pp. 21-22, Docket Entry No. 66-1, pp. 22-23. Defendants have contested the admissibility of several excerpts from Hayden's report, including the excerpt referenced here, under Federal Rule of Evidence 703. For the reasons stated in the text, defendants' objection to the excerpt from the Hayden report referenced here is **SUSTAINED**.

(b)   Unlawful Arrest of Neriz

Neriz appears to allege that GBunblee and Reyes deprived her of the right to be free from unlawful arrest.[38]

### (1)   Applicable Law

"An arrest is unlawful unless it is supported by probable cause." <u>Flores v. City of Palacios</u>, 381 F.3d 391, 402 (5th Cir. 2004). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge *at the moment of arrest* are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." <u>Id.</u> (quoting <u>United States v. Levine</u>, 80 F.3d 129, 132 (5th Cir.), <u>cert. denied</u>, 117 S. Ct. 83 (1996)).   <u>See also</u> <u>Haggerty v. Texas Southern University</u>, 391 F.3d 653, 655 (5th Cir. 2004) ("To ultimately prevail on [a] section 1983 false arrest/false imprisonment claim, [the plaintiff] must show that [the defendant] did not have probable cause to arrest him.").

### (2)   Application of the Law to the Undisputed Facts

Defendants argue that Reyes merely detained and did not arrest Neriz, and that Reyes reasonably detained Neriz for interference

---

[38]<u>See</u> Plaintiffs' Second Amended Complaint, Docket Entry No. 33, pp. 10-11 ¶¶ 75-87.  <u>See also</u> Defendants' MSJ, p. 4 ¶ 10, Docket Entry No. 60, p. 13 ¶ 10.

with   public   duties.[39]      Defendants   also   argue   that   following
GBunblee's  shooting  of  Perkins,  "Reyes  properly  realized  that
Neriz's residence now constituted a crime scene, and that evidence
must be preserved."[40]  In his affidavit Reyes stated:

> Deputy GBunblee was attempting to notify Dispatch of the
> shooting, but was unable to do so.  I then radioed
> Dispatch to notify them of the shooting in accordance
> with Sheriff's Office procedure.  Ms. Neriz entered the
> master bedroom.  I ordered her to get on the ground
> because deadly force had just been used and I did not
> know whether she was involved or not.  Also, this area
> was now a crime scene.  Finally, I had concern for
> officer safety.  Ms. Neriz did not comply with my orders
> to get on the ground.  She screamed at me numerous times:
> "What did I do?"  When I attempted to grab her wrist to
> handcuff her, Ms. Neriz resisted.  I tried to explain to
> her that she was not under arrest, she is being detained,
> but she refused.  Because of her failure to comply with
> my orders, I physically took Ms. Neriz to the ground by
> using an arm bar technique.  I then handcuffed and
> detained her.  I believed it was reasonable to detain
> Ms. Neriz in handcuffs at that time in order to determine
> the nature of her involvement, if any, with Perkins'
> attempt  to  evade  arrest.   I  also  believed  it  was
> reasonable to detain Ms. Neriz for investigation on a
> possible charge of interference with public duties.
> Ms. Neriz was escorted out of the residence and detained
> in the back of a police car.  I did not arrest Ms. Neriz
> at any time.  Sheriff's Office units began to arrive to
> investigate the use of deadly force.[41]

---

[39]Defendants' MSJ, p. 24 ¶ 57, Docket Entry No. 60, p. 33 ¶ 57.
See also Defendants' Reply, Docket Entry No. 73, p. 14 ¶ 23.

[40]Id.

[41]Reyes' Affidavit, Exhibit B to Defendants' MSJ, Docket Entry
No. 60-2, p. 4 ¶ 9.

Plaintiffs argue that "it was completely unnecessary for Reyes to have . . . initiated the action against Bridget Neriz."[42] Plaintiffs argue that Neriz testified at her deposition that

> Reyes called her "a bitch,["] pushed her forcibly to the ground in the kitchen and then put his knee in her back and handcuffed her [even though] she was not resisting him. See Neriz Dep. Tr., p. 25. She also testified that she was told that she was under arrest when she was taken out of her residence to a police car and forced to sit in the police car for four hours handcuffed.[43]

Plaintiffs contend Neriz' deposition testimony creates genuine issues of material fact for trial because reasonable fact finders could conclude therefrom that Neriz was arrested not detained, and that Reyes' decision to arrest Neriz violated her Fourth Amendment rights because the decision to arrest her was not reasonable under the circumstances.  Asserting that "Reyes' actions occurred after Perkins had been neutralized by the shot in the back by GBunblee,"[44] plaintiffs argue that "it was completely unnecessary for Reyes to have [] initiated the action against Bridget Neriz.  There is also evidence that Reyes was angry at Bridget Neriz for telling them that Perkins was not in the residence which accounts for him calling her 'a Bitch.'"[45]

---

[42]Plaintiffs' Response, Docket Entry No. 66, p. 34.

[43]Id. (citing Oral Deposition of Bridget Neriz, Plaintiffs' Exhibit 6, pp. 25:23-27:23, Docket Entry No. 66-6, pp. 26-28).

[44]Id.

[45]Id.

Police detention constitutes an arrest that must be accompanied by probable cause "if a reasonable person in the suspect's position would understand the situation to be a restraint on freedom of the kind that the law typically associates with a formal arrest."  See Freeman v. Gore, 483 F.3d 404, 413 (5th Cir. 2007) (citing United States v. Corral-Franco, 848 F.2d 536, 540-41 (5th Cir.), and United States v. Bengivenga, 845 F.2d 593, 596-97 (5th Cir. 1988)(en banc), cert. denied, 109 S. Ct. 306 (1988)). The undisputed evidence in this case establishes that after GBunblee shot Perkins, Neriz left the living room where GBunblee had told her to stay and entered the bedroom to ask what happened, and Reyes attempted to detain her.  When Neriz resisted, Reyes took her to the ground, handcuffed her, and placed her in the back of a patrol car where she remained for about four hours. On these facts, a reasonable person in Neriz's situation would believe that she had been restrained to an extent that normally accompanies a formal arrest.

Defendants argue that Reyes is entitled to qualified immunity on Neriz' false arrest claim because Reyes had reason to detain Neriz.[46]  In support of this argument defendants assert:

> It is undisputed that when questioned by Deputy GBunblee about whether Perkins was in the residence, Neriz told him, "No, nobody is in the house.  I live here by myself. Nobody is in the house."  See Neriz Audio Transcript,

---

[46]Defendants' MSJ, p. 24 ¶ 57, Docket Entry No. 60, p. 33 ¶ 57; Defendants' Reply, Docket Entry No. 72, p. 14 ¶ 23.

*p. 10, 1. 5-13.* Neriz did so because she did not want to get in trouble because Perkins was in her house. See *Neriz Audio Transcript, p. 12, 1. 17-20.* Seeing that Perkins was indeed in the residence, despite Neriz's denials, and now seeing that Deputy GBunblee had been required to use deadly force, Deputy Reyes was understandably concerned as to what Neriz's role was with regard to the shooting. As the summary judgment evidence establishes, Deputy Reyes reasonably believed Neriz should be detained on a charge of interference with public duties. See *Reyes Affidavit, p. 4.* Additionally, Deputy Reyes properly realized that Neriz's residence now constituted a crime scene, and that evidence must be preserved. See *Reyes Affidavit, p. 4.*[47]

Probable cause exists where the facts and circumstances within the officer's knowledge at the time of the arrest "'are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.'" Flores, 381 F.3d at 402 (quoting Levine, 80 F.3d at 132). Texas Penal Code Ann. § 38.15(a), Interference with Public Duties, states that "[a] person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with: (1) a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law." The statute contains an express defense to prosecution, however, if "the interruption, disruption, impediment, or interference alleged consisted of speech only." Tex. Penal Code § 38.15(d). Reyes argues that Neriz' conduct — leaving the living room where GBunblee told her to stay, entering the bedroom, and yelling — created probable cause to

___

[47]Defendants' MSJ, p. 24 ¶ 57, Docket Entry No. 60, p. 33 ¶ 57.

arrest her for Interference with Public Duties because she was interfering with their ability to investigate the use of deadly force. As explained in § III.B.2(a), above, the court has already concluded that GBunblee and Reyes had legal authority to enter and search the residence for Perkins. A reasonable officer could have concluded that by failing to obey GBunblee's orders to stay in the living room, Neriz was committing the offense of Interference with Public Duties. Viewing the facts in Neriz' favor, however, her allegedly disruptive conduct was essentially limited to speech, i.e., asking the deputies what had happened.

Although the probable cause inquiry is an objective one, it must be conducted in light of the actual facts known to the officer at the time of the arrest. See Devenpeck v. Alford, 125 S. Ct. 588, 593 ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."). At the time of Neriz' arrest, Reyes knew that Neriz had falsely told the deputies that no one else was in the house, deadly force had been used, and Neriz had left the living room where GBunblee had told her to stay and entered the bedroom close to where GBunblee had just shot Perkins. Even if Reyes did not have probable cause to arrest Neriz for interference with public duties because her conduct consisted exclusively of speech, Reyes did have probable cause to arrest Neriz for hindering apprehension in violation of Texas Penal Code § 38.05(a) which states:

A person commits an offense if, with intent to hinder the arrest, prosecution, conviction, or punishment of another for an offense or . . . with intent to hinder the arrest of another under the authority of a warrant . . . he:

(1) harbors or conceals the other;

(2) provides or aids in providing the other with any means of avoiding arrest or effecting escape . . .

The misdemeanor offense of hindering apprehension becomes a felony

if the person who is harbored, concealed, [or] provided with a means of avoiding arrest . . . is under arrest for, charged with, or convicted of a felony . . . and the person charged under this section knew that the person they harbored, concealed, [or] provided with a means of avoiding arrest . . . is under arrest for, charged with, or convicted of a felony[.]

Tex. Penal Code Ann. § 38.05(d). See Teal v. State, 230 S.W.3d 172, 174 (Tex. Crim. App. 2007). Whether Reyes was actually motivated to detain Neriz for other reasons is irrelevant. See Scott v. United States, 98 S. Ct. 1717, 1723 (1978) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.").

Because Reyes had probable cause to arrest Neriz for hindering apprehension in violation of Texas Penal Code § 38.05(a), the court concludes that Reyes had probable cause to arrest Neriz and did not violate Neriz' Fourth Amendment right to be free from false arrest. See Haggerty, 391 F.3d at 655. The court thus concludes that Reyes is entitled to qualified immunity on Neriz' unlawful arrest claim.

-30-

(c)   Excessive Use of Force Claims

Plaintiffs allege that in violation of the Fourth and Fourteenth Amendments Reyes used excessive force to arrest Neriz and GBunblee used excessive force to shoot and kill Perkins.[48] Defendants do not dispute that Neriz and Perkins were both seized within the meaning of the Fourth Amendment.   Nor do defendants challenge plaintiffs' allegations of injury from GBunlee's use of force against Perkins.   Defendants do, however, challenge plaintiffs' allegations of injury from Reyes' use of force against Neriz.   Defendants also argue that neither use of force violated constitutionally guaranteed rights because neither use of force was clearly excessive to the need or objectively unreasonable under the circumstances.   Thus defendants argue that they are entitled to summary judgment on plaintiffs' claims for excessive use of force.[49]


**(1)  Applicable Law**

To establish a claim for the use of excessive force under the Fourth and Fourteenth Amendments, plaintiffs must first produce evidence capable of showing that Neriz and Perkins suffered a

---

[48]Plaintiffs' Second Amended Complaint, Docket Entry No. 33, pp. 7-9 ¶¶ 50-63, and 10-12 ¶¶ 75-88.

[49]Defendants' MSJ, pp. 19-24 ¶¶ 48-57, Docket Entry No. 60, pp. 28-33 ¶¶ 48-57; Defendants' Reply, Docket Entry No. 72, pp. 9-11 ¶¶ 14-16, and 13-14 ¶¶ 19-23.

seizure. See Flores, 381 F.3d at 396 (citing Graham, 109 S. Ct. at 1871). See also Garner, 105 S. Ct. at 1699 (claims of excessive force to effect arrest are analyzed under Fourth Amendment standard). Plaintiffs must then produce evidence capable of showing that Perkins and Neriz suffered (1) an injury; (2) which resulted directly and only from a use of force that was clearly excessive to the need; and (3) the excessiveness of which was objectively unreasonable. Flores, 381 F.3d at 396. See also Freeman, 483 F.3d at 416 (same). "[T]he question [is] whether the totality of the circumstances justified" that use of force. Garner, 105 S. Ct. at 1700. See also Ikerd v. Blair, 101 F.3d 430, 434 (5th Cir. 1996)("The amount of force that is constitutionally permissible . . . must be judged by the context in which that force is deployed."). In Graham, 109 S. Ct. at 1865, the Supreme Court articulated three guideposts for courts to use when determining if a particular use of force was reasonable under the circumstances or excessive to the need. These guideposts — often referred to as the Graham factors — are: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to police officers or civilians; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by fleeing the scene. Id. at 1872. The Graham factors provide the framework for judging whether an officer's use of force was excessive. Newman v. Guedry, 703 F.3d 757, 761 (5th Cir. 2012), cert. denied, 134 S. Ct. 162 (2013).

-32-

**(2)   Application of the Law to the Undisputed Facts**

(i)   Reyes' Use of Force Against Neriz

Defendants argue that Reyes is entitled to qualified immunity on the claim that he used excessive force to arrest Neriz because he reasonably believed that Neriz should be detained for having committed an offense, and when she did not comply with his commands, Reyes properly and reasonably used an arm bar technique to take Neriz to the ground and handcuff her.[50]   Defendants also argue that Reyes is entitled to summary judgment on the claim for excessive use of force because Neriz is unable to cite any evidence capable of establishing that Reyes' use of force injured Neriz.[51]

Defendants do not dispute that Reyes seized Neriz within the meaning of the Fourth Amendment, and for the reasons stated in § III.B.2(b), above, the court has already concluded that Reyes had legal authority to detain and probable cause to arrest Neriz.   With respect to the first element that Neriz must show to establish a claim for excessive use of force, Neriz alleges that she "sustained severe mental and physical pain and suffering and injury in an amount that will be established at trial."[52]   Although a showing of significant physical injury is not required in the context of an

---

[50]Defendants' MSJ, p. 24 ¶ 56, Docket Entry No. 60, p. 33 ¶ 57.

[51]Defendants' Reply, Docket Entry No. 72, pp. 13-14 ¶¶ 19-23.

[52]Plaintiffs' Second Amended Complaint, Docket Entry No. 33, p. 10 ¶ 77.

-33-

excessive force claim, the Fifth Circuit does require plaintiffs asserting claims for excessive use of force to have suffered an injury. <u>Glenn v. City of Tyler</u>, 242 F.3d 307, 314 (5th Cir. 2001). "The injury must be more than a <u>de minimis</u> injury and must be evaluated in the context in which the force was deployed." <u>Id.</u> at 314 (citing <u>Williams v. Bramer</u>, 180 F.3d 699, 703 (5th Cir. 1999)). Neriz fails to cite any evidence capable of establishing that she suffered any injury from Reyes' actions. Because Neriz has not cited evidence capable of establishing that she suffered any injury, or that any injury she suffered was more than <u>de minimis</u>, the court concludes that Reyes's use of force to detain and arrest Neriz did not violate Neriz' Fourth Amendment right to be free from excessive use of force, and that Reyes is, therefore, entitled to qualified immunity on § 1983 claims for excessive use of force asserted against him in his individual capacity.

(ii) GBunblee's Use of Force Against Perkins

Defendants argue that GBunblee is entitled to summary judgment on plaintiffs' claim that he used excessive force to shoot and kill Perkins because GBunblee reasonably believed that Perkins posed an immediate threat to GBunblee.[53]  Plaintiffs argue that GBunblee is not entitled to qualified immunity for a number of reasons:

---

[53]Defendants' MSJ, pp. 19-24 ¶ 48-56, Docket Entry No. 60, pp. 28-33 ¶ 48-56.

-34-

(1) GBunblee was not lawfully inside the house at 17011 Analisa Circle; (2) Perkins did not pose a threat to GBunblee or to the public at large; and (3) GBunblee's version of the shooting is not credible.[54] The ultimate issue here is whether GBunblee's use of deadly force against Perkins was reasonable in light of the circumstances GBunblee faced at the time of the shooting.

Plaintiffs' argument that GBunblee is unable to establish that he was lawfully inside the house at 17011 Analisa Circle when he shot Perkins has no merit because for the reasons stated in § III.B.2(a), above, the court has already concluded that the valid felony warrant for Perkins' arrest authorized the defendant deputies to enter the house at 17011 Analisa Circle since they reasonably believed not only that Perkins resided there but also that Perkins was present inside when they entered.

Plaintiffs' argument that Perkins did not pose a threat to the public at large is not material, and plaintiffs' argument that Perkins did not pose a threat to GBunblee has no merit. Since GBunblee argues that he feared for his own life, whether Perkins posed a threat to the public at large is not material and has no bearing on the question of whether GBunblee's use of deadly force was reasonable under the circumstances. After reviewing all the summary judgment evidence, the court concludes that plaintiffs have failed to raise a genuine issue of material fact relevant to the

---

[54]Plaintiffs' Response, Docket Entry No. 66, pp. 27-33.

legal question of whether GBunblee's use of force was reasonable under the circumstances.

The undisputed evidence is that GBunblee knew that Perkins was charged with a violent offense, i.e., aggravated assault on a family member.   GBunblee's knowledge of the offense with which Perkins was charged put GBunblee on notice of a potentially dangerous arrestee.  Moreover, since GBunblee knew that Perkins was over six feet tall, weighed at least 250 pounds, had threatened to kill both Neriz, and himself with a gun in the house at 17011 Analisa Circle the previous month, GBunblee reasonably feared that Perkins was capable of using deadly force against him. GBunblee has testified:

> I searched the kitchen and the living room, which were located on the first floor.  I instructed Ms. Neriz to remain there.  I then went to the master bedroom, which was located on the southwest side of the house.  The room was dark, with the only light in the room coming from a television set on the east wall of the room.  I checked under the bed for the suspect.  I announced myself, "Harris County Sheriff's Department. Is there anybody in the room?"  There was no response.  I then went into the master bathroom, located in the southwest corner of the room.  The bathroom was completely dark.  I illuminated the bathroom with my flashlight.  I then attempted to open a walk-in closet door located to the south of the bathroom.  I also announced myself at the closet door, at least twice or three times.  There was no response.  The closet door would not open and I could feel a large object holding the door closed.  I pushed on the door again and it opened partially.  It was completely dark inside the closet, but I had the light from my flashlight, which was pointed directly at what I was confronted with.  I observed Perkins kneeling, crouching or squatting on the closet floor in front of me.  Perkins had his back to me and his arms and his hands in front of his body.  I ordered him to show me his hands at least

twice, saying, "Harris County Sheriff's Department. Put
your hands above your head."

> Perkins did not comply with my orders.  Instead,
> Perkins began to quickly and abruptly stand and turn
> toward me.  It appeared to me that his hands were coming
> around faster than the rest of his body.  I saw a black
> object in his left hand which was the approximate size of
> a handgun.  Knowing that Perkins assaulted Ms. Neriz with
> a pistol in the same closet the pervious month, I
> believed he was armed and intended to shoot me.  I was in
> imminent fear of death or serious bodily injury when I
> saw a black object in Perkins' hands and observed his
> hands coming around faster than the rest of his body.  I
> had only a matter of a second or seconds to decide
> whether to use deadly force.  I took a step back and
> fired one shot at Perkins.  He fell to the ground in the
> doorway of the closet.  He dropped the object which was
> in his hand when he fell.  I saw that the object was a
> black cordless telephone.[55]

GBunblee's undisputed testimony that he saw Perkins holding a black

object the approximate size of a handgun, that Perkins failed to

follow instructions to put his hands above his head and, instead,

quickly and abruptly began to stand and turn toward GBunblee,

coupled with the fact that Perkins was hiding in the closet to

evade arrest, establishes that GBunblee reasonably feared that

Perkins was attacking him.

Plaintiffs argue that GBunblee's version of the events is not

credible because there was a several hour hiatus between the

shooting and GBunblee's initial statement during which GBunblee was

able to confer with his attorney, because Hayden opined that the

deputies execution of the arrest warrant was unreasonable, and

---

[55]GBunblee Affidavit, Exhibit A to Defendants' MSJ, Docket
Entry No. 60-1, pp. 7-8, ¶¶ 15-16.

because of the opinion of plaintiffs' expert medical witness regarding the trajectory of the bullet that killed Perkins.[56] Citing Leonard v. Dixie Well Service & Supply, Inc., 828 F.2d 291 (5th Cir. 1987), plaintiffs argue that granting GBunblee's motion for summary judgment would be inappropriate because the court cannot grant GBunblee's motion without evaluating his credibility. Plaintiffs argue that the facts of this case are distinguishable from the facts of Small ex. rel. R.G. v. City of Alexandria, 622 Fed. Appx. 378 (5th Cir. 2015), and Ontiveros v. City of Rosenberg, Texas, 564 F.3d 379 (5th Cir. 2009), in which only the officers who shot and killed the suspects were able to describe the alleged actions of the suspects immediately before the shootings.[57] Plaintiffs argue:

> The rulings in favor of the police officers in the other two cases was based upon the finding that there was no record evidence which called into question the testimony of the shooting officers with regard to actions of the suspects which occurred immediately prior to the shootings. In other words, since the suspects were dead and could not contradict the officer's testimony, there were no genuine issues of material fact as to whether the officers violated the Fourth Amendment rights of the deceased suspects and therefore police officers were entitled to qualified immunity. *Small*, at p. 8.
>
> In this case however there are several genuine issues of material fact which contradict GBunblee's version of events and therefore summary judgment and qualified immunity in his favor are not appropriate.

---

[56]Plaintiffs' Response, Docket Entry No. 66, pp. 31-32.

[57]Id. at 30.

. . .

[U]nlike *Small* and *Ontiveros*, plaintiffs in the instant case have the benefit of two expert witnesses whose opinions have not been challenged by the defendants as falling outside of the requirements of Rule 26.

Philip Hayden categorically states that the execution of the arrest warrant was unreasonable because the officers went into an unlighted house and then divided their forces while undertaking a search of the house.   This created a one-on-one situation in a dark house which the officers had no prior knowledge of its layout.   They also used flashlights for illumination. Thus Hayden concluded that their search was unreasonable.

. . .

Plaintiffs' experts also challenged GBunblee's recitation of the alleged physical movements of Perkins while crouched in the closet.   GBunblee claims that he saw Perkins appear to begin to stand up and turn toward him; it appeared to him that Perkins' hands were coming toward him faster than the rest of his body; and he claims he saw Perkins holding a black object in his left hand, which appeared to be the approximate size of a handgun.

Dr. Adame[] clearly challenged GBunblee's statement of the movements and actions of Perkins when he opined:

> "Based on the anatomical findings at the autopsy, reasonable medical probability, and investigational information available, it is my opinion the decedent, GERRIT ALAN PERKINS, died as a result of a single penetrating distant gunshot wound of the right side of the back.   It is also my opinion that the decedent was in a low squatting position, possibly on his knees, with his back facing Deputy Charles GBunblee, consistent with the deputy's deposition testimony.   The trajectory of the projectile is depicted in the diagrams included with my autopsy reports.   The projectile track is from back to front (posterior to anterior), steeply upward and from slightly right to slightly toward the midline."

. . . Dr. Adame's statement regarding the trajectory of the bullet and where it struck Perkins does not support GBunblee's description of Perkins's movement at the time he shot Perkins. This is an important inconsistency which establishes a genuine dispute of material fact as to whether GBunblee's use of deadly force against Perkins on October 17, 2012 was objectively reasonable. Therefore, GBunblee's motion for summary judgment and qualified immunity should be denied.[58]

Plaintiffs' argument that GBunblee's motion for summary judgment should be denied because GBunblee's version of the facts is not credible has no merit. Plaintiffs have not cited and the court has not found any authority suggesting that a hiatus of several hours between the shooting and GBunblee's initial statement is capable of raising a genuine issue of material fact for trial.

---

[58]Id. at 31-33 (quoting Supplemental Designation of Dr. Adame, Plaintiffs' Exhibit 3, p. 4, Docket Entry No. 66-3, p. 7). Citing Federal Rule of Evidence 802, defendants have filed objections and a motion to strike Dr. Adame's expert report asserting that it is unsworn and, therefore, contains inadmissible hearsay. See Defendants' Objections and Motion to Strike Evidence from Plaintiffs' Response, Docket Entry No. 69, pp. 2-3 ¶¶ 2 and 4. Rule 56 requires that a party's submissions in opposition to a motion for summary judgment set forth facts that "would be admissible in evidence." Fed. R. Civ. P. 56(e). The opinions contained in Dr. Adame's report are premised upon a second autopsy that he performed on Perkins, his review of the first autopsy performed on Perkins at the Harris County Institute of Forensic Sciences, the Toxicology Laboratory Report on Perkins from the Harris County Institute of Forensic Sciences, and his review of excerpts from the GBunblee deposition. The opinions expressed by Dr. Adame in his report do not appear to violate Rule 802, and appear to be admissible under Federal Rules of Evidence, 702 and 703. Defendants have not contested the admissibility of Dr. Adame's report under Rules 702 or 703. Because defendants have not objected or moved to strike Dr. Adame's report as inadmissible under Rules 702 or 703, defendants' objections to the report are **OVERRULED**, and defendants' motion to strike Dr. Adame's report will be denied.

Neither Hayden's opinion that the execution of the arrest warrant was unreasonable, nor Dr. Adame's opinion regarding the trajectory of the bullet in Perkins' body, are sufficient to raise a genuine issue of material fact for trial because neither opinion conflicts with GBunblee's testimony that Perkins failed to follow GBunblee's order to put his hands above his head, and that GBunblee was in imminent fear of death or serious bodily injury when he saw Perkins' hands coming around faster than the rest of his body holding a black object about the size of a handgun.

After viewing all of the evidence in a light most favorable to plaintiffs, the court concludes that GBunblee is entitled to qualified immunity because plaintiffs have failed to cite any evidence from which the court could conclude that GBunblee's use of deadly force against Perkins was unreasonable under the circumstances. The following facts are undisputed. GBunblee was attempting to execute a felony arrest warrant against Perkins, an individual who GBunblee knew to be over six feet tall, weigh at least 250 pounds, and who only about a month before had assaulted Neriz with a deadly weapon in the master bathroom of the 17011 Analisa Circle residence. While searching the first floor of the residence, GBunblee called out to ask if anyone was present multiple times, but Perkins failed to state his presence. When GBunblee found Perkins hiding in the bathroom closet, GBunblee could reasonably have assumed that Perkins did not intend to

surrender and was perhaps lying in wait.  See Robinette v. Barnes,
854 F.2d 909, 914 (6th Cir. 1988) (holding that when an officer
"was forced to explore an enclosed unfamiliar area in which he knew
a man was hiding" and the suspect was afforded opportunities to
surrender and indicated he was unwilling to surrender, the officer
was "justified in using whatever force necessary, even deadly
force, to protect himself and the other officers and to apprehend
the suspect").

    After GBunblee found Perkins hiding in the closet and ordered
Perkins to put his hands above his head, Perkins failed to comply
with GBunblee's order and instead, quickly and abruptly began to
stand and turn toward GBunblee, GBunblee saw a black object in
Perkins' left hand that was the approximate size of a handgun.
Under these circumstances, GBunblee's use of deadly force to defend
himself was not unreasonable.  Because plaintiffs have failed to
cite any evidence from which a reasonable fact finder could
conclude that Perkins' version of the events is not true, the court
concludes that this case is analogous to Small, 622 Fed. Appx. at
381-83, and Ontiveros, 564 F.3d at 383-85, cases in which the Fifth
Circuit held that officers who shot and killed the suspects who
ignored orders to put up their hands were entitled to qualified
immunity based on their testimony that they reasonable feared for
their own lives based on the actions of the suspects immediately
prior to the shootings.  See Ontiveros, 564 F.3d at 385 (finding

-42-

officer entitled to qualified immunity where the officer fatally
shot unarmed suspect who reached into boot). Accordingly, the court
concludes that GBunblee is entitled to qualified immunity on
plaintiffs' claim for excessive force against Perkins.

## C.   **Harris County is Entitled to Summary Judgment**

Plaintiffs allege claims against Harris County for failure to
train and supervise Deputies GBunblee and Reyes whose actions
followed an unconstitutional policy ordered, sanctioned, and
ratified by Harris County through one or more of its policymakers.[59]
Harris County argues that it is entitled to summary judgment
because plaintiffs have failed to cite any evidence capable of
establishing that either of the defendant deputies violated any
rights guaranteed by the United States Constitution or federal
law.[60]   Asserting that at all relevant times Harris County had in
effect a constitutional policy regarding search and seizures,
arrests, and uses of force, and that there is no evidence that
Perkins or Neriz suffered a violation of their constitutional
rights to be free from unreasonable search and seizure, unlawful
arrest, or excessive use of force, or that Harris County failed to
train and/or supervise deputies GBunblee or Reyes on search,

---

[59]Plaintiffs' Second Amended Complaint, Docket Entry No. 33,
p. 12 ¶¶ 89-94.

[60]Defendants' MSJ, p. 27 ¶ 64, Docket Entry No. 60, p. 27 ¶ 64.

seizure, arrest, or use of force, Harris County argues that it is entitled to summary judgment on all of the § 1983 claims asserted against it in this action.[61]

A governmental entity can be sued and subjected to monetary damages and injunctive relief under § 1983 only if its official policy or custom causes a person to be deprived of a federally protected right. <u>Monell v. Department of Social Services of the City of New York</u>, 98 S. Ct. 2018, 2037-38 (1978). A governmental entity may not be held liable under § 1983 on the basis of <u>respondeat superior</u> or vicarious liability. Governmental liability under § 1983 requires proof of (1) a policy maker; (2) an official policy; and (3) a violation of a constitutional right whose moving force is the policy or custom. <u>Id.</u> See also <u>Cox v. City of Dallas, Texas</u>, 430 F.3d 734, 748 (5th Cir. 2005), <u>cert. denied</u>, 126 S. Ct. 2039 (2006) ("Municipal liability under . . . § 1983 requires proof of three elements in addition to the underlying claim of a violation of rights: 'a policymaker; an official policy; and a violation of constitutional rights whose "moving force" is the policy or custom.'").

For the reasons explained in § III.B, above, the court has already concluded that the defendant deputies did not violate federally protected rights of either Perkins or Neriz by entering to search the residence at 17011 Analisa Circle in an attempt to

---

[61]<u>Id.</u> at 24-31 ¶¶ 58-70, Docket Entry No. 60, pp. 33-40, ¶¶ 58-70.

execute the felony arrest warrant for Perkins (§ III.B.2(a)), by
arresting Neriz (§ III.B.2(b)), by using excessive force to arrest
Neriz or by shooting Perkins (§ III.B.2(c)(2)(i)-(ii)).   Because
the court has already concluded that plaintiffs have failed to
present evidence capable of showing that GBunblee or Reyes violated
any rights guaranteed by the Fourth or Fourteenth Amendments to the
United States Constitution, the court concludes that Harris County
is entitled to summary judgment on all the § 1983 claims that
plaintiffs have asserted against it in this action.   See Monell, 98
S. Ct. at 2037-38.


## IV. __State Law Wrongful Death/Survivor Action__

Citing Texas Civil Practices & Remedies Code § 71.002, and
asserting that GBunblee's use of excessive force resulted in
Perkins' wrongful death, plaintiffs allege that Harris County is
liable to Perkins' statutory beneficiaries for damages caused by
Harris County's  wrongful actions.[62]   To support a claim for
wrongful death under Texas law, plaintiffs must allege that death
resulted from the negligent or wrongful act of a person or his
agent or servant.   Id.   Asserting that it is entitled to
governmental immunity, Harris County moves for dismissal of the
wrongful death and survival claims asserted against it.

---

[62]Plaintiffs' Second Amended Complaint, Docket Entry No. 33,
p. 9 ¶¶ 64-68.

Political subdivisions such as Harris County have governmental immunity except where the state legislature has waived that immunity in the Texas Tort Claims Act (TTCA). See Tex. Civ. Prac. & Rem. Code § 101.21; City of Dallas v. Albert, 354 S.W.3d 368, 373 (Tex. 2011) ("[I]mmunity from suit deprives courts of jurisdiction over suits against entities unless the Legislature has expressly consented[.]"). Governmental immunity applies "to subdivisions of the state, such as counties." Alcala v. Texas Webb County, 620 F.Supp.2d 795, 801 (S.D. Tex. 2009) (citing Harris County v. Sykes, 136 S.W.3d 635, 638 (Tex. 2004)). The limited waiver of governmental immunity provided by the TTCA is for claims arising from the use of publicly owned vehicles, premises defects, and injuries arising from conditions or use of property. Id. The TTCA does not waive immunity for intentional torts, such as assault, battery, false imprisonment, false arrest, and civil conspiracy. Franka v. Velasquez, 332 S.W.3d 367, 376 & n. 35 (Tex. 2011) (citing Tex. Civ. Prac. & Rem. Code § 101.057(2)). All common law tort claims alleged against a governmental unit are presumed to be governed by the TTCA regardless of whether the TTCA waives immunity for the claim[s] at issue. Id. at 378 and 385. The wrongful death and survivor claims that plaintiffs have asserted against Harris County are therefore precluded by Harris County's immunity as a governmental entity because these claims do not fall within the limited waiver of governmental immunity provided by the TTCA.

-46-

## V. Objections and Motions to Strike

### A.  Plaintiff's Motion to Strike Affidavit of Jared Zwickey

Plaintiffs have filed Plaintiffs' Motion to Strike Affidavit of Jared Zwickey, Docket Entry No. 67.  The court has resolved the defendants' motion for summary judgment in the defendants' favor without relying on or referring to the affidavit of Jared Zwickey. Accordingly, plaintiff's motion to strike that affidavit of Jared Zwickey will be denied as moot.

### B.  Defendants' Objections and Motion to Strike Evidence

Defendants have filed Objections and Motion to Strike Evidence from Plaintiffs' Response, Docket Entry Nos. 69 and 70. Citing Federal Rule of Evidence 802, defendants object and move to strike the reports of Phil Hayden and Dr. Adame by asserting that both of these reports are unsworn and, therefore, that they contain inadmissible hearsay.[63] Rule 56 requires a party's submissions in opposition to a motion for summary judgment set forth facts that would be admissible in evidence.  Fed. R. Civ. P. 56(e).

The opinions contained in the Hayden report are premised upon Hayden's review of 37 different documents received from plaintiffs' attorneys.[64]  Defendants have contested the admissibility of several

---

[63]Defendants' Objections and Motion to Strike Evidence from Plaintiffs' Response, Docket Entry No. 69, pp. 1-3 ¶¶ 1 and 3 (Phil Hayden Report), and ¶¶ 2 and 4 (Dr. Adame Report).

[64]See Attachment # 3 to Plaintiffs' Exhibit 1, Philip Hayden
(continued...)

excerpts from the Hayden report under Federal Rules of Evidence 403 and 703 because they present material that is speculative and unreliable.   For the reasons stated in § III.B.2(a)(2)(ii) and n. 40, above, the court **SUSTAINS** defendants' objections to Hayden's opinion that the defendant deputies' search of the residence at 17011 Analisa Circle was unreasonable.   Since, however, the court has been able to resolve defendants' motion for summary judgment without relying on any excerpts from the Hayden report to which the defendants have objected, the defendants motion to strike the remainder of the Hayden report will be denied as moot.

The opinions contained in Dr. Adame's report are premised upon a second autopsy that he performed on Perkins, and in his review of the first autopsy performed on Perkins at the Harris County Institute of Forensic Sciences, the Toxicology Laboratory Report on Perkins from the Harris County Institute of Forensic Sciences, and excerpts from the GBunblee deposition.   Defendants have not contested the admissibility of Dr. Adame's report under Rules 702 or 703.   For the reasons stated in § III.B.2(c)(2)(ii) and n. 80, above, the court **OVERRULES** defendants' objections to Dr. Adame's report, and because defendants have not moved to strike Dr. Adame's report under Rules 702 or 703, defendants' motion to strike Dr. Adame's report will be denied.

---

[64](...continued)
Expert Opinion Report, pp. 21-22, Docket Entry No. 66-1, pp. 22-23.

## VI. **Conclusions and Order**

For the reasons stated in §§ III-IV, above the court concludes that the defendants are entitled to summary judgment on all of the claims asserted against them in this action.   Accordingly, Defendants' Motion for Summary Judgment (Docket Entry No. 60), is **GRANTED**.   For the reasons stated in § V.A, above, Plaintiffs' Motion to Strike Affidavit of Jared Zwickey (Docket Entry No. 67), is **DENIED as MOOT**.

For the reasons stated in § V.B, above, the objection that defendants have raised to excerpt from the Hayden report discussed in § III.B.2(a)(2)(ii) and n. 40, above, is **SUSTAINED**, the objections that defendants have raised to excerpts from Dr. Adame's report discussed in § III.B.2(c)(2)(ii) and n. 80, above, are **OVERRULED**, and defendants's motions to strike the reports of Phil Hayden and Dr. Adame, are **DENIED**.   Thus, Defendants' Objections and Motion to Strike Evidence from Plaintiffs' Response (Docket Entry Nos. 69 and 70), are **GRANTED IN PART AND DENIED IN PART**.

**SIGNED** at Houston, Texas, this 10th day of November, 2016.

SIM LAKE
UNITED STATES DISTRICT JUDGE